Good morning, Your Honors. Just let me know when you're ready. We're ready. Zachary Potter for Appellant, Wyatt Technology Corporation. May it please the Court. Wyatt Technology Corporation is an award-winning, family-run business in Santa Barbara that was started by Dr. Phil Wyatt, who is here with his family today, three decades ago with an idea and a small business grant.  standard in terms of light scattering technology. In this case, in their appellate briefs, the defendants have accused Wyatt of trying to use the litigation process itself to create a case. And during this oral argument, I'll explain to the Court that the exact opposite is true, that the defendants used the litigation process to ensure that this Court and the district court would never hear the merits of the case. Wyatt is a successful, high-technology company, and one of its competitors, Malvern, decided that it wanted a piece of the same business. But Malvern didn't play by the rules. Instead of creating technology, it took it. This case, in our view, presents a terrible injustice. The wrong that happened has gone unremedied, and worse, Wyatt has been ordered to pay the defendants' attorney's fees despite the following facts. There is no question at this point in the case, no legitimate dispute whatsoever, that the former employees that are at the heart of the case took data and proprietary information from Proterion, which is the company whose assets Wyatt bought, that they took the information, they put, for example, Madison, the employee who's really at the heart of this case, he took information from Proterion, he put it on his home computer, he took it from his home computer, he put it on his Malvern laptop, and then we know that from the Malvern laptop they created the Madison CD, and the information was sent to Malvern UK. We know this now. And we also know, on the basis of emails that were produced after the first summary judgment motion was entered, that Madison was working hand-in-hand, collaborating with the programmer in the United Kingdom on the creation of the competitive source code. Once the ZetaCyzor Nano was completed, and once their competitive software was completed, it got worse because Malvern started a false advertising campaign, it's labeled the Brain Shark campaign, that they labeled the truth. And in the Brain Shark advertising campaign, and I don't think that this can be disputed, they took Proterion and Dynapro data, and in the advertising campaign, Ulf Knobman, one of the former employees, says orally, you can hear it during the campaign, all of the data came from the ZetaCyzor Nano. And that's not true. It came from the Wyatt's Dynapro. And in addition, what makes it worse is that they also cited to peer-reviewed scientific literature, and they removed the name Dynapro from the name of the scientific literature, so that when they're saying all this data came from the ZetaCyzor Nano, you wouldn't be able to figure out that that was not true. Now, the reason why that matters in this case? Let's get down to the fundamentals, Mr. Potter. It seems there's two basic requirements for infringement, this copyright infringement, that's being alleged here. One is possession, and I don't think that's disputed. You mean access. Access. I'm sorry, access. But you showed that they had access and possession, I guess. Well, despite the fact that we believe the evidence was undeniable of access, undeniable. They did dispute it. Well, okay. Yeah. But let's just say you had access. Yeah. Let's focus on the substantial similarity aspect, because that's key. Would you agree? I would agree that that is the key. And so far, you're doing a very wonderful job of laying out the case, much better, I think, than your lawyer did, the lawyer down at the district court, who it looks like, by any fair account, struggled in making these arguments that you've made very cogently right now. That's unfortunate. But I think that's the record. And it looks like the district court tried desperately at times to get information, try to make sense of what was being pled and alleged, and ultimately had to decide whether there was substantial similarity. To do that, they needed the source code. Correct. And that was never produced. That's correct. And we actually feel that that is one of the most outrageous parts of the case, because here's what happened. Well, it's outrageous, I guess, on a broad front, because it's not clear that the lawyer below did everything that the lawyer could or should have done to produce the source code and to get at it during the discovery period, even though they were given much opportunity to do so. So I guess I would like for you to address that, because I think that's very critical to your case. I agree. That's probably the most critical aspect of this case. And so our position on that is, first, with respect to the production of the source code, it was requested at the beginning of the case, and then it wasn't produced by the defendants. And they claimed, well, we don't have any access to the source code. It's held by Malvern, U.K., we're Malvern, U.S., and we can't get at it. Now, what came out during the summary judgment process? And we believe that because this information came out during the summary judgment process itself, and it was also apparent on the face of their own papers, that we have a very serious issue of them failing to meet their burden of production and also undermining a position that they espoused throughout the case. They said, okay, we don't have any access to the underlying source code, and so you can't get it from us. But then what did they do on summary judgment? They went to Malvern, U.K., and they got four declarations from Malvern, U.K., employees about the source code, two of which were from the key Malvern, U.K., employees, and it's the classic sword-shield problem. They used the shield and said throughout the course of the case, and they said, we can't give you the source code, we can't get within this locked box. And then on summary judgment, they open up the locked box, they get declarations from the programmer, and the programmer says, trust me, I didn't misuse any information. There's none of your source code in the source code that I wrote. Don't worry about it. But, of course, in discovery, if they have access to that locked box, so should we for the purpose of cross-examining the truth of what they're stating. And then what also happened is they gave us a stack of e-mails on August 7, 2009, which is after the first summary judgment motion was entered. And these e-mails are e-mails between Madison and Grayson, the programmer, where they're discussing the code. They were collaborating hand-in-hand on the development of this code. And what every case that looks at these sorts of facts says is, if you can get this information for the purpose of winning a summary judgment motion, and if you can get this information during the course of your regular business affairs, you have to produce the whole file, the good and the bad. And what happened here was they took out of this locked drawer the three pieces of paper that they wanted the court to see. And they didn't give us the 97 pieces of paper that we would be able to use to say, something wrong happened here. We know they took data. We know they took data from Proterion, and they delivered it to Malvern. We know that much. And so the question is, what did they do with it once they got there? And they said, don't look behind the curtain. But, of course, we have a right to look behind the curtain. It's the only way in a case like this to prove what happened when somebody was programming competing source code. And what we also know is that the competitive source code performs in a way, at least this is the summary judgment record, performs in a way that would be impossible without copying. And we were also able to show, and again, we don't have their source code, so we can't do the type of analysis that we need to do. But from the e-mails that they produced after summary judgment was entered, we're able to draw a line from Proterion to the Madison CD, to an e-mail from Madison to Grayson, and then from Grayson to the Zetacizer nanosource code. He says to Dr. Madison, tell me about this code that you've written. I don't understand it. Why have you done it in this way? And then Madison responds, well, I did it this way for X, Y, and Z reason. And we're able to show that that came from the Madison CD and that the Madison CD came from Proterion. Remember, what the record shows is that Madison went home every single day while he worked at Proterion, and he took his zip disk, is what he testifies to, and he put it into his computer at Proterion. He copied everything that he did that day, and he was supervising the outside programmer at Proterion who was programming dynamics. He took that zip disk, and he put it in his home computer, and then he had all of the records that he needed at home, and he would work on dynamics. And he said it took one and a half to two man years to create these programs. Then after he leaves Proterion, he testified that he took his home computer Proterion folder where he's been putting all of this valuable information, and he transferred it to his Malvern laptop. I mean, this is the sort of case that we should have the right to look behind the curtain and see what happened with it. You did have the right and the opportunity to do that, but it seems like, you know, the inability to be able to compare the source code and then, I mean, not a lot, it appears, was done by the lawyer, Wyatt's lawyer below, to aggressively get that source code, even though they were given, again, repeated opportunities. I would disagree with the repeated opportunities, and there's a couple of things that I want to point out with respect to that. First of all, we've cited to a number of cases regarding the burden of production and 56F relief, where, number one, the overriding interest is the interest of justice in having cases decided on the merits. Second, he did request it, and what the cases say is that once you've requested it, the filing of a motion to compel is not mandatory. And in RTC, which is Resolution Trust Corp., a First Circuit case, there's a quote that I wanted to read on this point, which is RTC's argument. They essentially said it was a 56F moment. The plaintiff said, give us more time. They haven't given us what we've asked for, and it's the critical evidence in the case. And the defendant said, well, you didn't file a motion to compel, so even though you asked for it, you know, tough beans. And what the court said is RTC's argument is reminiscent of an embezzler who seeks to avoid consequences of his defalcation by criticizing the victim as having been careless with his funds or slow in reporting shortages to the police. Now, I know that the district court counsel could have done more, and he was outgunned in this case. And the district court counsel has been representing the Wyatt family. He's essentially a solo practitioner for 30 years. And he would – and Malvern has very capable, very good attorneys. And during the critical time period, not only did they put together very convincing sounding motions, which I believe that we've shown have erroneous legal arguments and facts in them, but they were very quality briefs. And he wasn't able to keep up. He wasn't. But we have chosen our arguments very specifically to be tailored to the burden of production and non-waivable issues. And, for example, their position that we don't have custody and control over the source code and, therefore, the fact that he didn't get it and he now doesn't have that evidence on summary judgment, that is an issue that, one, their own papers show to be untrue. So at the level of appeal, that's enough for us to be able to raise it. And, second, their motion is a classic burden of production motion, which is to say, yes, this is information within our custody and control, but he doesn't have it right now, so, therefore, we should get summary judgment. And what the case law says on either adverse inferences or 56 F relief is that the case that I want to read to you is, this is Carmona v. Toledo, another First Circuit case. And what the Court says is, in a situation like this where somebody is pointing to a lack of evidence in the record for summary judgment, not a piece of evidence that defeats the claim, it says, before ruling on summary judgment, we think the district court should have looked more carefully into those issues and ascertained whether the plaintiffs have received a full and fair chance to discover relevant evidence in the hands of defendants. And there's one other point about the production of the source code that I want to point out that is fairly critical in this case. In May of 2009, district court counsel for both sides began this process of looking for a neutral expert to do a side-by-side comparison. Judge Zebrowski from ADR Services was hired, and that occurred on May 12th. On July 15th, Judge Zebrowski wrote to defendants' counsel and said, I need more time to find the right expert to compare the source code. And in response to that, instead of saying, okay, we'll agree to a 56-F request or we'll agree for some sort of procedure where that process can resolve itself, instead they filed a motion for summary judgment on the basis of their failure to produce the source code. And I would suggest that that is unfair, but also the fact that the motion that they filed at that time showed that they had control of the source code from the beginning, including these e-mails that they produced after the first summary judgment motion was entered, demonstrates why the procedure below wasn't fair to the Wyatts, even though Wyatts' counsel was not as good as the defendants' counsel. And why is that? Why wasn't the procedure fair even though the counsel was not effective or diligent? Well, okay. So first, when you've entered into a procedure to have the source code analyzed and the party that both sides have selected says, I need more time, to then ignore that and file for motion for summary judgment because we never gave it to you, I believe is unfair. And then second, to say that we don't have control of the source code when your own records show that you do is also unfair. This is not ‑‑ I'm not sure if any ‑‑ if the court is interested in their head convention argument, but this is something that the district court believed, and it's actually legally erroneous. We think that the cases that we have cited are clear as a bell that this is not a head convention case. When a U.S. affiliate works with its foreign parent in the way that Malvern U.S. did, and when a U.S. affiliate is able to get information, attorney's eyes only information from its parent company for the purposes of winning their case, then it can get that information for the purposes of discovery as well. And so to take the position from the beginning of the case, well, we're not going to give it to you, we're not going to give it to you, we're not going to give it to you, and surprise, we have it for our own benefit, that's not how summary judgment works. That's not how the discovery procedures work. I'm not sure if I've answered your question on that. I'd like to reserve the remainder for rebuttal. Thank you. May it please the Court, my name is Mark Hadad, and I represent the appellee Malvern Instruments U.S. I'd like to begin by going through the procedural background here, because I think as the argument this morning has developed, understanding why the district court judge Pragerson reached the judgment he did on the copyright claim was not only the correct judgment as a matter of law, but certainly very fair procedurally in every aspect to the plaintiff, Wyatt. And much of what has been put forward to explain unfairness, in fact, is not faithful to the record that's before this Court. Before I go through the key procedural history, though, I think it's important to step back and understand why the claim about the source code being copied was fundamentally implausible. The overriding copyright claims, which were dismissed and were not appealed, were the claims that the screen displays on these two devices were copied, that the Malvern screen display copied the copyrighted Wyatt display. And the district court judge found that the protectable aspects of those screen displays were not copied. So what was left was the argument that the source code which generated the screen displays, nevertheless, was a copy of the Wyatt screen display's source code. Now, that's an implausible notion, given particularly the limited protection, the thin protection that's accorded source code. It's sort of fundamentally implausible to think that whatever is protectable about the source code would be generating, and is generating a different screen display, would be copied. But if they were going to prove that claim, as the Court has noted this morning, they would have to prove both access and substantial similarity. And the only way to do that was by comparing the source codes side by side. Now, the first time Wyatt asked for the source code was in August of 2008 in a discovery request. And they just asked extremely broadly, we want all your documents. It wasn't a specific request. Within a month, Malvern U.S. responded saying, you know, here's what we're willing to do. Here are our objections. You should be aware that we, the sales affiliate of the U.K. company, do not have possession, custody, or control over the source code. You need to know that now. And you can get at the source code through a couple of options. You can use the Hague Convention. We voluntarily told them that. So their lawyer knew, even if he was unfamiliar before, he knew about the Hague Convention. And we went beyond where the law requires by offering a second option, which was to give our source code, the Malvern U.K. volunteer to give its source code, to a neutral third party who would then hold it side by side and do the evaluation. Now, why would Malvern U.K. want to exert some control over its source code but be willing to give up e-mails or other documents? The reason is obvious. Source code is a very important trade secret. There is no evidence that the sales affiliate needed to have the source code to carry on its business. And the competitor asking for this source code was not just any competitor. It was a competitor that had already been found guilty of committing computer wire fraud in a decision upheld by this court. So keeping control over your source code is an understandable position for Malvern U.K. to take. Didn't you, in the e-mail that you're talking about, specifically indicate that even if they followed that procedure, you were not going to give, MIL will not release the source code to attorneys or other advisors engaged by Wyatt? How would it help them if you give it to some neutral party when they're dealing with a summary judgment issue and they don't know what it is? What they would get if the neutral agreed that the source code was substantially similar is they would get the source code. That was the agreement that the parties eventually entered into. But two points to further on follow that, Your Honor. One is Wyatt waited until the end of the original discovery period, just a couple weeks before the discovery cutoff in March of 2009, to even ask about the neutral process. Second, and more fundamentally, if Wyatt did not want to use the hate convention, if Wyatt did not want to use the neutral process, or if Wyatt thought there was anything unfair about the neutral process, which it agreed to, it could have brought those concerns to the magistrate. When it went in, there was an initial two-month extension of discovery, which Malvern agreed to. Wyatt then moved for another two-month discovery extension, which the district court granted in full. And Malvern opposed that, and there were several documents at issue and depositions at issue, one of which was the source code that was mentioned. And the district court judge says, I'm not taking any position on any of these things that you're asking for. You take those to the magistrate if you can't work it out yourselves. That's in the judge's order, granting Wyatt's 56F. Now, Malvern availed itself of the magistrate. The magistrate was readily available, and thanks to the magistrate, it was not until September and October that Malvern was finally able to get documents that Wyatt had withheld, thousands of pages of documents. But conversely, Wyatt never went to the magistrate and said, we need help getting the source code, even though the district court invited Wyatt to do that. Instead, Wyatt pursued its theories about this LS shareware, which is not source code for the set-asizer nano. It pursued a deposition of a U.K. employee, which it got, Mr. Pryor, who didn't write the C++ source code for the set-asizer nano. And they pursued a 30B6 witness, and they pursued third-party discovery from AOL. And they got all of that discovery before the summary judgment hearing. And this morning, for example, when counsel says they didn't get the e-mails until after the summary judgment motion, counsel's not referring to the summary judgment motion on the source code. He can only be referring to the summary judgment motion on the screen displays because their very opposition to summary judgment and their request for additional time on the 56F, their second request for that, was supported by all of these e-mails. So they had the CD they talked about this morning in March. They got a second deposition of Mr. Madison to talk about that CD. They had this shareware, which is not the source code of the instrument, but is rather written in Visual Basic and serves a different purpose. They had that in May, several months before the hearing on summary judgment. They had all the e-mails he talked about before their opposition was due. They attached them, and they were all before the judge on summary judgment. And then they got all of the additional discovery that they wanted, the two depositions and the documents from AOL, they got all of that in August of 2009. And the judge continued the hearing twice until September 21st. And at that point, when the judge issued his opinion on September 23rd of 2009, he said, the request for more discovery has moved. You've told me you've gotten everything you asked for, all the reasons. You got all the e-mails. You've had the depositions. You've gotten the third-party discovery from AOL. You haven't identified anything else you need. And he knew that there had been repeated meet-and-confers over the Hague Convention for a full year, because, remember, they were told in September of 2008 that they could use the Hague Convention. Now, the Hague Convention alone and the Supreme Court's decision in Societe Nationale Industrielle Aerospatiale, which we cite at some length and which my French teacher would be pleased to know I could say this morning, that case alone disposes of their argument, because if the court looks particularly at page 541, the first full paragraph of the Supreme Court's decision in Aerospatiale, it makes very clear that both parties and third parties are entitled to invoke the procedures. The procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the convention. And footnote 26 of the opinion makes clear that first use of the Hague Convention can be expected in some cases to yield more evidence more promptly than use of other procedures. So it would be a first for the court to say that a defendant who is a non-party located abroad, whose country is a member of the Hague Convention, for them to offer and say we are available, amenable to production through the procedures of the Hague Convention, and to do that immediately upon receiving a discovery request that could encompass such proprietary documents, no court has ever said that that's an abuse of discretion. In fact, what the Supreme Court was doing in this decision was reversing lower court opinions that had said the Hague Convention can be disregarded. If they wanted to make a case at any point that in the unique circumstances of this case, the Hague shouldn't apply, in the unique circumstances of this case, there was control or custody or whatever, they had to raise those arguments below. Because Malvern would be entitled to make its full record below. But they just did nothing. And while one can have sympathy, certainly, for Wyatt looking at the papers that its client that its lawyer produced, that only goes so far because the client here is a sophisticated client. It had sued another competitor using the same lawyer and had lost. It had retained the same lawyers that it has retained, the same law firm, Holland & Knight, to represent it on the appeal of the Viscotec case, which involved the same cut-and-paste trade secret allegations that they cut-and-pasted and brought against Malvern. At the same time, the very year, 2008 to 2009, that Holland & Knight was representing Wyatt before this court in the Viscotec litigation with these overlapping claims, they were being defended by their lawyer in the trial court. So if the client thought they needed more lawyers, they knew where to go find more lawyers. They had already hired more lawyers. So it is incumbent upon this litigant, no less than any other litigant, to bring, to be diligent about seeking discovery. That's a requirement for getting a Rule 56-F extension, is to show diligence in getting discovery. And this litigant did not do that. And the lack of diligence about going after the source code, I think, is part of a broader pattern. And this is, if the Court wants to really understand why Judge Collins, as well as Judge Pragerson, concluded that it was appropriate to award attorney's fees, it's this broader pattern that this fits into. Obviously, the source code is what they needed if they were going to prove their case. But the source code is two-edged. If the source code comes out and is totally different, their case is gone. They can't talk about laptops being destroyed or, you know, adverse inferences, you know, from e-mails that have nothing to do with C++ source code that could be confusing to a jury. They can't use all of the evidence that has never been held by any court to establish substantial similarity, because the source code itself would destroy the argument. The award of attorney's fees, do we look at that under an abuse of discretion or clear error? Well, the factual findings you look at for clear error, for both copyright and for the trade secrets. Under the Lanham Act, it's a de novo. I'm sorry. De novo is what I meant to say, abuse of discretion or de novo. Right. For copyright and for trade secrets, it's abuse of discretion. For the Lanham Act, it's de novo. And when the Court looks at the Lanham Act, de novo, I think it's important to step back and see the broader pattern, because it's repeated across the different claims that Wyatt brought. What the Court saw was that while on the one hand Wyatt had evidence of literal falsity in terms of using some Dynapro data in the Malvern ad, what they did not have and what they knew they did not have was any evidence that this was material to any customer who bought a Malvern instrument rather than a Wyatt instrument. They had no evidence that the Malvern instrument didn't perform as advertised, didn't generate accurate data. That was not their case. And they actually had affirmative evidence, which they long resisted producing and which it took motions to compel repeatedly to produce, that showed that the reason their customers went away from them was because the Malvern instrument offered other capabilities, such as the Zeta potential capability of measuring the attraction and repulsion of particles, that their instrument didn't measure. So that's why they didn't do a customer survey. That's why they withheld production of their documents that show this. That's why they deliberately chose not to interview their customers about this or to present customer testimony. They knew they couldn't prove materiality, which is an independent element of the claim under the Lanham Act. So they were putting their head in the sand about that, claiming $28 million of damages, and yet knowing that the basis for that was not a material statement in the ads. And when you added that up with the cut-and-paste trade secrets, the resistance of identifying what the protectable trade secrets were, the discovery abuse on that, and when you saw the strategic decision never to really pursue the source code but to try to make up a story out of this LS shareware, which they had months before their summary judgment was due, and if it had anything to do with the C++ source code, and I'd be happy to try to unpack this for the Court if the Court would like, but the bottom line was that Judge Pragerson was absolutely right when he went through independently, looked at the record, and said, this doesn't have anything to do with the source code that drives the display of the Malvern instrument. That's written in a separate language, and you've had this LS shareware. If you can use it to show some relationship or equivalence between the visual basic source code that drives the shareware and the C++ that you've copyrighted, go ahead, show me that. But they didn't, and they couldn't. They still haven't done it even in their briefs on appeal. So while they have packaged up more rhetorically compelling stories, none of it gets over the fundamental facts that are right in the record that show a lack of diligence, of pursuing very easy ways of getting the evidence that they knew from day one would be required to prove their copyright claims, and their resistance to producing their own internal documents, which showed, for example, that there was no merit to their Lanham Act claims and that those should have never been filed. And when you see that their trade secret claims were cut and pasted from the Viscotec case, where Judge Tavrisian threw all of those out and this Court affirmed, then you begin to see a pattern of bad faith litigation, which certainly is more than sufficient under the abuse of discretion standards for both copyright and trade secret to make the attorneys fee award for both copyright and trade secrets not an abuse of discretion. And then for the reasons that I explained a moment ago, the Lanham Act should be affirmed de novo because of the deliberate knowledge and decision not to investigate materiality because they knew they couldn't meet that element.  Thank you, Your Honor. Quickly, to address the Lanham Act statement that you just made, it's absolutely untrue that we had no evidence of materiality. There was evidence in the record. First of all, materiality was never the subject of a motion for summary judgment. So the fact of this evidence being in the record was never called, but it is in the record.  The resume of these machines, what the data that they generate, and whether they've been used in peer-reviewed scientific journal articles, is what the customer base, the professors, are looking for. They're going to buy machines that other professors have used and have been able to publish using. And so when they used the resume of the DynaPro to validate their own machine, that is a material misrepresentation. And in addition, when you have literal falsity, which is fairly undeniable, and I didn't really hear him denying it, you get all kinds of different presumptions and you're able to get injunctive relief, unjustified enrichment, and the court found at least enough evidence of actual damages for that claim to survive summary judgment. I want to talk a little bit more about this idea of diligence, that it's all Wyatt's fault, that it didn't get the source code. First, this process of the neutral, it was in May, it was agreed upon by both parties, and they abandoned it so they could file their motion saying, you know, you didn't get the evidence that we control, even though we're now using that very same evidence to get summary judgment against you. But second, the district court judge found, so Wyatt moved for an extension of discovery because on May 19, 2009, is when the LS shareware was produced to Wyatt, which is ten days before the close of discovery. And this, along with the e-mails that were produced after the first summary judgment order was entered, and the first summary judgment order did relate to the source code because the source code was involved in both the trade secret and the copyright counts because the use of our source code would be a trade secret violation and a copyright count. So the LS shareware is produced ten days before the close of discovery, and this is complicated stuff. I mean, the attorneys can't just look at these CDs and decide, oh, this, you know, it's not like when you receive a piece of paper, an employment discrimination case, and you can kind of figure out how it relates. You need experts to look at it. It needs to be analyzed. So this is given to us ten days before the close of discovery, and we asked the court for an extension of discovery. Time's up. We'll give you another minute. Okay, thank you. So we asked for an extension of discovery, but that extension is not given until July 6th, which is after the first summary judgment motion has been filed. And we're only given 21 days of discovery. But if I could show you the volumes of material that were filed in conjunction with their summary judgment motion, that 20-day extension was no extension at all because no discovery could be taken during that time, while simultaneously responding to thousands of evidentiary objections, to every single line of every single declaration that we filed. Meanwhile, they're still holding on to the e-mails that would help Wyatt trace both the trade secrets and the copyright claims from Proterian to Malvern, U.K. They're still holding on to them while they're opposing our 56-F request, while they're opposing our motion for extension of discovery. And then now that we have it all, we're able to piece it together a little bit, but what we know is they were able to access the vault, the vault that they said they couldn't access for the purpose of getting summary judgment against us and denied us access. And the last thing I want to say on this is we also had evidence that one of the former employees' laptop, after the commencement of discovery, was scrubbed. Now, I haven't seen any other case in a source code data theft case where post-commencement of the litigation, the primary source for evidence regarding that has been scrubbed with a white program and no adverse inference has been imposed under those circumstances. And so what we believe is that there's an overall pattern. The L.S. shareware, a critical component of our case, was produced after all the depositions were taken. We've never had a chance to depose Madison on the L.S. shareware. He did not he had initially denied memory of having a Madison CD of the L.S. shareware. Now we have it and we have the e-mails which were produced after the close of discovery in one business day before our second summary judgment opposition was due, one business day. And Madison's never been deposed on those e-mails. We think that when they show at the last moment, yes, we have access to all of this information. We want summary judgment on the basis of it. And they deprived us of it for the entire case. At a minimum, the case should be remanded and the orders vacated so we can explore these issues at a minimum. Thank you very much for your time. Thank you, Captain. Thank you both. The case is arguably submitted.
judges: Molloy, Reinhardt, Murguia